Thank you, Your Honor. My name is Samuel Paz. I represent Mrs. Morales and Mr. Sotero who are here with us. I – before I start, Your Honor, I would like to address the issue of how the Court would like to proceed. We did receive the order, yesterday's order, to brief O'Brien in the Clark case. I'm prepared to address that issue, or I'm prepared to proceed with my argument or answer questions. Well, let me – let me start out. And what I'm telling – what I'm going to say is just for me, you understand, just me, speak for myself. You know, I've spent a lot of time thinking about this. Your Honor, may I just interrupt for – could you turn your microphone? It's to the side. It is hard to hear you. Oh, okay. Thank you. How's that? Much better. Good. Here are my – my observations. And they are that I think the facts of this case may fit better under the intermediate scrutiny test as stated in U.S. v. O'Brien and Clark v. Community for Creative Nonviolence. Now, as I understand what happened here – and I've gone through the record. It's a little summary. Three students left school. And leaving school without permission made them subject to discipline. And there's punishment for the rules of the parent handbook. And that's at E.R. 302, 303. Now, the maximum punishment for the first occurrence or unexcused absence is after-school intervention. Now, the maximum punishment for first occurrence, unexcused absence, is Saturday Academy. Now, Mr. Bennett threatened the students – or this is the allegation – with going to juvenile hall for a couple of years, getting the police involved, making parents pay a $250 fine and suspension if they did not tell Bennett who else left the campus, and possible expulsion. All right. Now – now, this is what I'm thinking about. And that is whether the excess increment of punishment, if that is based on the students going to the immigration protest rally, to the extent that that punishment exceeded what the students would normally be given for leaving school without permission, then there may be a violation of their First Amendment rights. And I think they should be able to recover under 1983. Now, if an increment of that punishment is related to the students' ethnicity, then that could be a recoverable – that increment could be recoverable as – as well. And, you know, depending upon the facts, there is no infliction of emotional distress. So that's the way I see it. You know, this is – you've got a lot of stuff here. We could be talking about this for a long time. But I'm only speaking for myself. Thank you, Your Honor. So tell me where I'm wrong. I agree with your – I agree with your analysis, Your Honor. I think that's the basic point that we wanted to bring to the table. There's also one other point I'd like to raise that I think shows that under either O'Brien or under the Tinker analysis set forth in most of the cases that have dealt with student speech, including the most recent one that the Ninth Circuit did in Morris v. Fredrickson, the notion is, is that if there's no disruption of school activities, if there's no harm or threat to any student, and if the activity takes place off campus, then the standard is strict scrutiny. And the standard is unless there is that substantial disruption, then the First Amendment has been violated. I'd like to point out ER in the record. Under the City of Ontario – I'm sorry, the Ontario Board of Education's policy under ER-562, it is the policy for First Amendment issues, and it basically tracks Tinker. But most importantly, it says there's a section near the bottom of the page that says, and I'm paraphrasing, essentially that expression will be protected and is First Amendment-protected activity unless there is a direct threat to a student or to the school's institution or unless there's actual disruption. So I think what we have in – under either the O'Brien situation or under Pinard, which is essentially the center case that we're relying on, you have a situation where you have protected activity, and the district court found that there was protected activity, and then for some reason he got sidetracked into the Levine case. And I think he was sidetracked because Levine really had to do with a boy who wrote a rather disturbing poem and had a long history of real problems at school, including depression, fights, other situations. They're laid out in the footnote under my discussion in the opening brief. But the court, our district court, I think, misapplied Levine because Levine really had to do with whether the school could take action to protect the child. And they suspended the boy and told him to go home. He couldn't come back until a psychiatrist examined him and gave him a release to come back to school. Now, that's to protect them. In our situation, and I think the court was absolutely incorrect to apply Levine to our situation because Mr. Bennett wasn't forecasting. He wasn't forecasting a possible harm to the boy, either by his own stuff, by his own activities, because the poem had to do with basically a Columbine kind of a situation where he was threatening to do harm to teachers and other students. Rather, it had to do with wanting to protect that boy. So I think the court erred because, really, they were acting before the conduct occurred. Here, I think the court was incorrect Here we have a situation where the conduct occurs, it's off campus, it's peaceful, nonviolent, the kids had no problem, and although it's not on the record, they're they were accompanied by the police, they were watched by adult monitors, and there was no problem at the march. They marched together, they yelled in protest, they wanted this immigration to happen. These children didn't march. Pardon me? No, they actually went to the march. And you'll see it's tracked pretty carefully, and I did, it's in the reply brief. I thought they didn't find the march. Oh, no, no, no. They went home. No, the declaration of, it sets forth very clearly in Annette Prieto, who was the other plaintiff who was here, as well as the statements, they went to the march, they left school early, they went to Ontario High School to wait for the other students to leave, and the facts are very Which was in lockdown. Right. They were in lockdown. Once the school day ended, and for that district, all the schools were ending at 1130, then the school came out, they joined the high school students That's after the school day. Yes. And they walked to the, they did the march, and it was approximately, I think they said they walked about five miles, and it was about two and a half hours It doesn't matter what they did after the school day, does it? What we're concerned about here is what happened during the school day. Well What they did here during the school day was ditch class. No. Your Honor, if I can address that point. We do care about what happens after school, because that, it's still First Amendment protected activity. In other words, the fact that they were off campus After school, they can do whatever they want. They can march, they can stay home, they can do whatever they want. Exactly my point. During schooling. Exactly my point. The school was over at 11. Right. Exactly my point. So the only punishment there should have been for leaving school early should have been the regular application of the school regulation at ER 303. Truancy. Truancy. What's that even, truancy? Truancy under the State Code and under the regulations at Ontario say that truancy is three absences. Okay. Well, what do you want to call it? They left school without authority. That's exactly what the Without permission. That's exactly what the regulation says. Leaving school without permission is to be disciplined for one day, either after school or one day on Saturday at campus. What they lost was the privilege of going to Disneyland. I'm sorry, Your Honor. What they lost was either the privilege of going to Disneyland or going to a dance. Well, they, they, that's, that's adopting Mr. Bennett's contention about what occurred. I think the court, the district court at this level is required, and I've laid it out in my reply brief very carefully, all of the, all of the misstatements that were omitted from the district court's resuscitation about what happened when Mr. Bennett called him in to his office and what happened. He wasn't just talking about losing it after school. He was talking about jail. And these are not the ideal essential. I don't know what can happen to them. No, no. But for truancy, if they, if they leave school, then they do it consistently. The difference is, Your Honor. One of them had done this before and was in trouble. The difference is, Your Honor, if you look at, on our opening brief, the arguments in Authorities at page 18 to 21 in the reply brief on page 4 to 6, these are the statements by Mr. Bennett were not conditional. These were direct statements of threats. He made threats of punishment. Yes. Threats, not conditional. They were threats of punishment. Is that punishment? You're going to jail. He made threats. He said if you do this kind of thing, you can get picked up. No. I'm sorry, Your Honor. I'm sorry. He made threats of punishment. Yes, sir. Threats, punishment? Yes. Are threats punishment? No. May I? Yes, Your Honor, they are. Just a threat is punishment.  Yes, Your Honor. Absolutely. That's where I really disagree. And may I point you to the authority that in the recent case of Fogle v. Collins at 531F3rd 824, this is June of 2008, this was the Volkswagen that had the sign that said weapons of mass destruction on board, the man was prosecuted for making threats. The Court says, no, these aren't threats. The Court says, in most cases where the courts have found the threatening speech, it was targeted against specific individuals or communicated directly to the subject of the threat. And that's at page 830. That's a true threat. If you look carefully at the declarations of the three children that were in the room with Mr. Bennett, they were true, unconditional threats. You're going to prison for two years. That's different than if you do this, it could happen to you. So there's a dis — and the other thing the Court has to appreciate, you had — all the kids in there had not been absent at all that year. Every one of them should only have been disciplined to Saturday Academy at the max. One was on probation of some sort for bringing a knife to school. Anthony Sotero had a year before been on probation for bringing a knife to school. He was — Mr. Bennett took him to the authorities. He went to juvenile — to the hearing proceeding. He was placed under probation. He did his time. He cooperated with everything. The probation was over. So this wasn't — the punishment was, as you — if you follow and track the — the policy of the school regulation, then you only are limited to discipline. The discipline imposed is different than punishment. True threats under the law are punishment. And I think true threats have been prosecuted under Federal and State statutes. True threats are prohibited by Civil Code 51.7. True threats are something that — I'm sorry, Your Honor, but every person I have spoken to, every parent is absolutely astonished when they — when they hear the facts of this case and that a boy goes home and commits suicide because of those threats the same day and leaves a suicide note implicating Mr. Bennett. That, Your Honor, I think is beyond the pale. I don't think that this is a stern lecture as the Court tried to construe it. These were direct threats, and the kids believed it. The evidence is in the record. The other thing that I'd like to point out, Your Honor, once you — that case you decided you can just fill out a dump sheet to — on the O-8 case. Yes. The Fogle v. Collins case? Yes, Your Honor. The second case I'd like to, I think, enforce the point about true threats and how they cause harm is Redding v. Safford Unified School District at 504 Fed 3rd. This is a September 2007 case. It was reversed en banc on July of 2008. And in that case, a 13-year-old girl was suspected of having some over-the-counter drugs. She was wearing a pair of tight pants and a T-shirt, and the school strip-searched her. And the Court — the Court really brought it home to me. It says it doesn't require a constitutional scholar to conclude that a nude search of a 13-year-old child is an invasion of constitutional rights of some magnitude. More than that, it is a violation of any known principle of human dignity. The Court went on, then, to rely on some studies that strip searches like this have actually motivated kids to attempt suicide. And that's at page — page — You're over your time. I'm sorry, Your Honor. I think I have a minute and 13 left? No. No, that's — you're in the hole. All right. I'll stop now, Your Honor. All right. May it please the Court? Jacqueline DeWaar-Variessa on behalf of Respondents. I would like to address Judge Fregerson's inquiry as to your understanding of the facts. There are a couple of corrections I would like to make, which I believe are very important corrections. The students — it is true, the students were subject to discipline simply for the act of leaving school, for being truant. They were not disciplined for what they did once they left school. However, the basis of that discipline was not just the parent handbook. It was also based on an eighth-grade letter sent to parents notifying them of the year. Anthony and his friends were in eighth grade. They were graduating shortly within that timeframe. And the actual discipline that was imposed was in accordance with that letter to parents. The actual discipline imposed in this case is also very important. Now, we need to distinguish between that actual discipline as opposed to the alleged threats and stern lecture. At the end of the interview and inquiry that Mr. Bennett had in his office with those four students who had been earlier that day identified to him by another student, and as the assistant principal, it was his duty to follow up and investigate, he called them into his office. We know who the other — we do know who the other student was, don't we? Excuse me, Your Honor? We do know who the other student was. We have Anthony, Annette Prieto, who is also a plaintiff in this case. Yes. And then two other students who are not plaintiffs in this case, and a fifth student who Mr. Bennett never found the identity of. Well, who was the one that pointed the finger at these students? A student who was unrelated to this group of students who actually left school. The impression has been left by opposing counsel that at the end of that meeting these students walked out with the understanding that they could, i.e., go to jail, pay a — these are things that were going to potentially still happen to them. They could go to jail, their parents would have to pay some sort of a large fine, so on and so forth. You heard it. Yes. And what you're saying is that that's not reality, that there was a closed — in other words, that at the time they walked out they in fact already had their school, doubt left that these other things that they were lectured about could have ever happened to them. Well, of course, no one here can — Well, I'm asking you what's in the record. Within the record itself, yes. We do have the two declarations from Anthony's mother as well as her deposition, which clearly states that when she spoke to him on the phone that afternoon he indicated to her that he had gotten in trouble for walking out of school, that Mr. Bennett was the one who caught him, and that he had lost an end-of-the-year privilege. Nothing else was included. Well, didn't Mr. Bennett, nobody bother to talk to him? Yes. I'll retell the events that day if there's some confusion. Well, there is. This is a pretty significant thing, don't you think? Yes, I'd be happy to. Because that's their contention. Their whole contention is that these threats themselves were an actionable constitutional violation and that they caused this boy to commit suicide and they should be entitled to damages for it. So if, in fact, the facts are that what happened at the end of the meeting was that they were given a definitive punishment so that these threats, in fact, were abated, don't you think that's important? Yes, and I'd be happy to address that. Thank you, Your Honor. They were given the choice of choosing whether to lose the Disneyland trip or the eighth-grade dance. Each of the students in the declarations that were written two weeks after this event have admitted to that. None of the students wrote in their declarations that any other discipline was imposed at that time. Well, in fact, Mr. Bennett had no ability to carry out that kind of discipline. That is correct, and that's why it's more plausible that the lecture he gave was, in fact, a warning as to what could happen to these students when they did school. Now, Anthony had knowledge of how the juvenile system works because it is true that the year prior he was caught with a knife at school, which is a violation of California Education Code 48900B. What did that knife look like? There is a picture of it in the record. Okay. It's about this long, and it has a sharp, curved edge. Now, also in the record is the fact that Anthony's mother admitted that he was still on probation and that both he and his mother knew that if he violated his probation, that he would potentially have to go to juvenile hall for three years. So for him, there was a potential. That is in the record. He was fully aware of that. Well, this is a tragic case. There's no question about it. I think any human being is going to feel sorry for this family. That is true. But that's, of course, the law. He imposed more punishment than the rules called for, didn't he? I mean, you know, the maximum punishment for that first occurrence, the minimum was after-school intervention. I'm not sure what that means. The maximum was unexcused absence, Saturday Academy. But the punishment that was imposed was you can't go to some dance or you can't go to Disneyland. Correct, Your Honor. And once again, that was in accordance with the letter that went home to the eighth-grade parents about the heightened conduct that was expected from the graduating class. And that isn't unusual. When you have a graduating senior class, whether it be from middle school or high school, to try to discourage students who are about to graduate, not only in this district, since it was a K-8 district, they were graduating not only from that school, but from the entire district. And so the possibility of imposing discipline such as a Saturday Academy was running out near the time of the end of the year. So it's not unusual in those circumstances for schools to inform students and parents that as a possible violation, one of their privileges could be taken away. If they were at the high school level, it might be a senior night or something equivalent to what was taken away here, which was either the Disneyland trip. But that is not in the parent handbook, is it? That's correct, Your Honor. Yes. It's not in it. The district is not limited to the parent handbook. I would also like to point out, and this is a very important point, that the alleged threats that Mr. Bennett made are actually all covered under the California Education Code. There is a ca- And this is all on the record. There is a California Education Code that allows for the arrest of minors who are found outside the school premises during the school day, and that may be either by a peace officer or a school administrator. Once they are arrested, and this is upon a first violation and taken into custody, they can either be brought back to the school or to the police station, and their parents called and informed of the violation. The fact that a parent fine could be imposed as well is part of the Education Code, and that's upon a first violation. In other words, all the threats that Bennett made were simply a repetition of the actual laws that were in existence. That's correct. Which would be slight. That is correct. Well, it depends on how he said it, too. You know, I was an eighth grader once. There you go. And we had a tough boys' vice principal. He could scare the blank, blank, blank out of me just by looking at me, you know. And I was not a perfect child, either. And I just, even when I saw him maybe 20 years ago, and he was an old guy, and I was bigger than he was, and he stood before me at a retirement dinner, and I looked at him and I said, you know, Mr. Pratty, it's been a long, long time, but why are my knees shaking as I stand before you? You know. In Mr. Bennett's defense, I'd also like to point out. And he was Dalton Henderson's principal, too. So, you know, I mean, those things, you get a principal who says something like that to you. I mean, it can be, depends on the voice and how they do it, and whether they got a paddle in their hand or whatever. But so I'm just wondering, you know, this is summary judgment, but there seems to be some disputed facts here. I'd like to address the point that you just raised, Your Honor, if I may. Anthony was the one student of that group who had a prior history in interacting with Mr. Bennett the year prior for his violation of the dangerous object portion of the education code by bringing the knife to school. So Anthony was aware of how the juvenile system works. He was aware that Mr. Bennett could not send him to jail, that Mr. Bennett could not impose the fines, and that there was a legal system in place that would take care of, you know, assessing whether or not that discipline or that punishment. You know, that's an argument that could be made to a jury. You know, the principal tells you something, or the vice principal. I'd also like to point out that because Anthony is no longer with us, we have no more facts to uncover as to his frame of mind. We have the declaration of Annette Prieto and her deposition, and we have Anthony's mother's impression of his state of mind on that day. There are no more facts to be uncovered as to Anthony's state of mind, unfortunately. We just have the knowledge of his prior interaction with Mr. Bennett and then what the students said occurred in his office that day. I'd also like to point out in Mr. Bennett's defense that prior to becoming assistant principal at De Anza, he was the counselor. He has a master's degree in counseling. He's taken courses on the prevention of teenage suicide, its detection, and also its treatment for the symptoms. And he stated in his declaration that when he gave the lecture to the students that morning, he had no reason to believe that any of them were so or felt so intimidated that they would have harmed themselves as a result. Now, this lecture occurred early in the morning that day. Each of the students then returned to class for the remainder of the day, finished their classes, and went home without incident. And there were no reports from teachers about aberrant behavior of any of the students? That's correct. In fact, the principal, Kathleen Kinley, when she first found out about it, and keep in mind she had planned to retire the day after this incident, she had submitted a letter of retirement as early as February 2nd of that year, and this incident occurred on March 30th. She was retiring the very next day, so that afternoon when the police officer called the school and told him of this unfortunate incident, she immediately started an investigation with the remaining time that she had, and she could not uncover any statements from any teachers of anything unusual from any of the students that were disciplined that day. Well, you can't tell a lot of times what's going on in kids' minds, but we do know that suicide is the number one cause of death for teenagers. Isn't that right? I agree, Your Honor, and the only direct evidence we have in this case is Anthony's suicide letter that was found at the scene, and I want to remind the Court that he does mention Mr. Bennett, but he also mentions that he killed himself because he had too many problems. Yeah. He mentions that his love for his family, that he's going to tell his grandmother hello for his family. He mentions to tell his father, I'm sorry for making you mad, and to give him his 49er jersey. Yeah. He also asks his family to take care of his job. There was a lot on this young man's mind. Well, as I said before, it's a tragic, very tragic and unfortunate situation, and it's an unbearable pain for the family, obviously. Okay. Are there any further questions I may address for the Court? I don't think so. Thank you. Thank you. Yes, Your Honor, I think about two minutes. How about a minute? I'll do my best, Your Honor. Yeah, because we, you know. In asking or responding to the question that was asked by Judge Hall, what was in their mind when they left the office of Mr. Bennett and whether it was just the school sanctions, please, I direct you to ER 242, paragraphs 8 and 9. That's the declaration of Annette. And page 245, paragraphs 7 through 10, both of them state affirmatively when they left, they believed they were going to jail. They were afraid. They had to deal with their parents because they believed the threats. Well, how could they have believed they were going to jail? They were returned to class. They went to class, and then they went home. They believed, nonetheless, that Mr. Bennett was going to have them jailed. They believed it. Mr. Bennett didn't have the authority to jail them. It's pretty clear that they did not. And they chose, they gave them a choice of what kind of punishment to have. That's not the evidence. I'm sorry, Your Honor. I just have to disagree with you. You must read the declarations of the people that were in the room. They will tell you what happened. And it wasn't as was argued, nor is it as the district court adopted the defendant's version of the facts. That's the difference in the case. Okay. We got your argument. Thank you, Your Honor. Thank you. All right. The court will adjourn until 5 minutes after 9 tomorrow morning. All rise for the second and third.
judges: Pregerson, Hall, Ezra